# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One black iPhone 16, currently sealed in Homeland Security evidence bag # A1560028, and one black iPhone 16 sealed in Homeland Security evidence bag # A1560027, both currently held in the Homeland Security Investigations Colorado Springs evidence room and more fully described in Attachment A, attached hereto. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 25-sw-583-TPO |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the District of <u>Colorado</u>, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(5) | Unlawful Possession of Ammunition by Alien Admitted Under a Nonimmigrant Visa |

The application is based on these facts:

- ☒ Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Adam Jennings*
*Applicant's signature*

SA Adam Jennings, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by <u>telephone</u>.

Date:    <u>4/23/25</u>

Timothy P. OHara
<span style="font-size:small">Digitally signed by Timothy P. OHara<br>Date: 2025.04.23 16:20:09 -06'00'</span>
*Judge's signature*

City and state:    <u>Denver, CO</u>

Timothy P. O'Hara
United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A:

One black iPhone 16, currently sealed in Homeland Security evidence bag # A1560028, which is encased in a clear plastic cell phone protective case, and one black iPhone 16 sealed in Homeland Security evidence bag # A1560027, which is encased in a clear plastic cell phone protective case both of which were kept in continuous secured possession from time they were seized, incident to the arrest until they were secured as evidence, hereinafter, and in Attachment B referred to as the "Device(s)", currently stored in the Homeland Security Investigations Colorado Springs evidence room located at 415 E. Pikes Peak Avenue, Suite 200 Colorado Springs, CO 80903.

**ATTACHMENT B:**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

For the Device(s) listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of 18 U.S.C. §§ 922(g)(5)(B) (hereinafter referred to as "**Subject Offenses**"):

1. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of **Subject Offenses**:

2. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device(s) or by other means for the purpose of committing violations of **Subject Offenses**.

3. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of **Subject Offenses**.

4. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of **Subject Offenses**.

5. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of **Subject Offenses** or that show who used, owned, possessed, or controlled the Device(s).

6. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device(s), or that aid in the identification of persons involved in violations of **Subject Offenses**.

7. Credit card information, bills, and payment records pertaining to violations of **Subject Offenses**.

8. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of **Subject Offenses**.

9. Evidence of who used, owned, or controlled the Device(s) to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call

logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

10. Evidence of software that may allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

11. Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence.

12. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s).

13. Evidence of how and when the Device(s) were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

14. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device(s).

15. Passwords, encryption keys, and other access devices that may be necessary to access the Device(s).

16. Contextual information necessary to understand the evidence described in this attachment.

DEFINITIONS:

17. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## INTRODUCTION AND AGENT BACKROUND

I, Adam Jennings, (Your Affiant), am Special Agent ("SA") with U.S. Department of Homeland Security, Homeland Security Investigations (HSI) being duly sworn, depose and state under penalty of perjury that the following is true to the best of my information, knowledge and belief.

1.      I have been employed in this capacity since September of 2019. Since beginning my employment with HSI, I have attended and successfully completed the Criminal Investigator Training Program, and the HSI Special Agent Training Course at the Federal Law Enforcement Training Center. I have been a law enforcement officer for approximately 13 years. Prior to employment as a Special Agent with HSI, I was a Trooper with the Colorado State Patrol (CSP) in a patrol capacity, and for approximately two years was assigned to a specialty unit, the Smuggling and Trafficking Interdiction Section under CSP's Criminal Investigations Branch. As a member of this team, I was responsible for enforcing state criminal and traffic laws and was designated to interdict the trafficking of humans, including those being sexually exploited, and the smuggling of all forms of contraband including firearms, illegal drugs, and bulk cash. Prior to employment with the Colorado State Patrol, I was employed as a police officer by the City of Alamosa Police Department (Colorado) in both patrol and investigation capacities, entrusted to enforce city and state laws, and to prevent and investigate all types of crime. Prior to that, I worked as a police officer for the Adams State College Police Department (Colorado), entrusted with the security of the campus, while enforcing campus regulations and state laws, while attending college. I attended a 27-week academy at the Colorado State Patrol academy, and a basic peace officer academy at the Trinidad State Junior College Colorado Law Enforcement Training Academy. Further, I have attended over 500 hours of advanced training relevant to criminal interdiction and investigations, in addition to the time at the aforementioned training academies. I have been the

initiating officer or primary investigator in over 600 criminal cases. I have also investigated numerous cases which involved contraband being smuggled and/or trafficked. This includes humans, illegal weapons, ammunition, stolen property, fraudulent/forged documents, bulk cash which derived from criminal/illegal proceeds, and illegal drugs to include: fentanyl, heroin, methamphetamine, cocaine, ecstasy, prescriptions, marijuana, and more. As a part of my duties, I investigate numerous criminal violations including those related to violations of Title 21, Title 18, Title 19, Title 31 and Title 50 of the United States Code.

2.    Your affiant knows from training, experience, and discussions with other law enforcement officers and investigators that firearms traffickers often keep various records which relate to the ordering, distribution, purchasing, and transportation of controlled substances.  These records often include ledgers, financial transactions, contacts, receipts, photographs, audio / video recordings, and lists of sources / customers.  These records and information are often kept on smart phones, cellular phones, computers, data storage / cloud storage, and other electronic devices.

3.    Your affiant knows from training, experience, and discussions with other law enforcement officers and investigators that the trafficking of firearms can generate large sums of money and currency that require the keeping of detailed records.  Your affiant is aware that the trafficking of firearms often requires the cooperation and association of a number of individuals within a trafficking organization.  As a result of this, firearms traffickers will often possess electronic devices and other records or data that identify the other members within the organization.  This data and information can include contact lists, address books, notes containing names and cellular telephone numbers, and text message or other correspondence between these individuals.  This data and information are kept by traffickers whether or not the dealer is in actual possession of firearms at any given moment.

4.    Your affiant is also aware from experience that firearm traffickers take photographs and/or videos of themselves, their associates, their properties and assets, quantities of controlled substances, and firearms and that these individuals maintain these photographs and / or videos in smart phones, computers, and media / data storage devices.

5.    Your affiant is aware that these firearm traffickers often use cellular telephones to communicate either by telephone calls, video calls, or text.  These communications often include instructions, intentions to associates, and to report on illegal criminal activity.  Your affiant is aware that evidence of these instructions, plans, reports, and general discussions of criminal activity is sent and / or received in the form of incoming and outgoing text messages and voice messages.  Your affiant is familiar with the methods in which text messages are sent and received through third party phone applications (most commonly referred to as "Apps") which are widely used.

6.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

7.    This affidavit is submitted in support of a search warrant of One black iPhone 16, currently sealed in Homeland Security evidence bag # A1560028, which is encased in a clear plastic cell phone protective case, and one black iPhone 16 sealed in Homeland Security evidence bag # A1560027, which is encased in a clear plastic cell phone protective case both of which were kept in continuous secured possession from time they were seized, incident to the arrest until they were secured as evidence, hereinafter, and in Attachment B referred to as the "Device(s)" and both of which are currently stored in the Homeland Security Investigations Colorado Springs evidence room located at 415 E. Pikes Peak

Avenue, Suite 200 Colorado Springs, CO 80903, as described in Attachment A and were in the possession of by Cesar Ramon MARTINEZ SOLIS and Humberto Ivan AMADOR GAVIRA during the commission of violations of 18 U.S.C. § 922(g)(5)(B), Unlawful Possession of Ammunition by Alien Admitted Under a Nonimmigrant Visa.

8.      I submit the facts below to outline probable cause to believe that, on March 26, 2025, in the State and District of Colorado, MARTINEZ SOLIS and AMADOR GAVIRA, both  aliens of the United States, and both having entered the United States on a nonimmigrant visa, were found in possession of and transporting a large amount of ammunition, which MARTINEZ SOLIS stated was purchased in Utah.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

9.      Several items are held in evidence at the Homeland Security Investigations Colorado Springs Evidence Room in Colorado Springs, Colorado, which were discovered incident to the arrest of MARTINEZ SOLIS and AMADOR GAVIRA on March 26, 2025, and during the execution of search warrant on April 14, 2025, of a vehicle they were operating at the time of arrest. These items are all being held in the Homeland Security Investigations Colorado Springs evidence room located at 415 E. Pikes Peak Avenue, Suite 200 Colorado Springs, CO 80903. The items in question are: One black iPhone 16, currently sealed in Homeland Security evidence bag # A1560028, which is encased in a clear plastic cell phone protective case, and one black iPhone 16 sealed in Homeland Security evidence bag # A1560027, which is encased in a clear plastic cell phone protective case,  hereinafter, and in Attachments A and B are referred to as the "Device(s)."

10.     Your Affiant believes there is probable cause to believe that the Device(s) are or contain evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES. The applied-for

warrant would authorize the forensic examination of the Device(s) for the purpose of identifying electronically stored data particularly described in Attachment B.

11.     The Device(s) are currently in the lawful possession of the Homeland Security Investigations. They came into the Homeland Security Investigations' possession in the following way: The Device(s) were taken into possession on March 27, 2025, following an incident to arrest of Humberto AMADOR GAVIRA and Cesar MARTINEZ SOLIS, stemming from a traffic stop conducted by the Fremont County Sheriff's Office and the discovery of approximately 186,200 rounds of ammunition. Therefore, while your Affiant might already have all the necessary authority to examine the Device(s), your Affiant seeks this additional warrant out of an abundance of caution to be certain that an examination of the Device(s) will comply with the Fourth Amendment and other applicable laws.

12.     The Device(s) are currently in storage at Homeland Security Investigations Colorado Springs Evidence Room, 415 E. Pikes Peak Avenue, Suite 200 Colorado Springs, CO 80903. In my training and experience, I know that the Device(s) all have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Device(s) first came into the possession of the Homeland Security Investigations.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

13.     A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts.  Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data and can have the capacity to store many gigabytes of data.  Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet.  They operate as GPS navigation devices and can store information about where they have been.  They also contain digital cameras. The camera can mark a photo with location data so that upon examination it can be determined where and when a photo was taken.  These images can sometimes be recovered even if the user has deleted the image. The smartphone can also connect to the internet using wireless connections, which allow for images, files and other information to be uploaded directly to the Internet or to other digital storage devices or computers.  Smartphones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations.  They can also operate as a "tablet," or mobile computer, and can contain software programs called

6

applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet. They also operate as personal digital assistants and have contacts and calendar functions. They also can contain media such as music and other files in large quantity.

14.    The Devices are Apple products which are currently locked. It appears that they are equipped with "Touch ID" or "Face ID". The fingerprints or face authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require. The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode. Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone. If the operating system is version 9.3 or later, that time frame shrinks to 8 hours. Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful.

15.    Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint. Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

7

16.    Based on my knowledge, training, and experience, your Affiant knows that computers and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

17.    Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

18.    There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

     a)  Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

     b)  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

     c)  Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

     d)  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

19.    Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were

used, the purpose of the use, who used the Device(s), and when. There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

a) Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b) Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c) A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f) Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: evidence from phone calls orchestrating the distribution of the aforementioned heroin to the undercover agents, but also to the other violator(s) involved. It also may contain photographs of the heroin, and other evidence relevant to the distribution and trafficking of illegal drugs, along with phone numbers of other potential violator(s).

g) Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a

.pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

h) A single compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. These drives can store thousands of images and videos at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

20.    Need to review evidence over time and to maintain entirety of evidence. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is

not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

21.     Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

22.     On March 26, 2025, at approximately 10:35 PM, Detectives Krueger and Keller from the Fremont County Sheriff's Office (FCSO), were traveling westbound on US Highway 50 in Cañon City, in the State of Colorado, when they observed a white Chevrolet van traveling eastbound that failed to dim its headlights as it passed, in violation of state law.  The detectives also observed that this vehicle's license plate lamp was defective and/or not operable and the vehicle failed to signal its intent to turn before turning into a gas station. Therefore, they initiated a traffic stop.

23.     This vehicle was a 2017 GMC passenger van, bearing Durango, Mexico registration number FYR797E, and Vehicle Identification Number (VIN) 1GTW7BFF6H1329305.

24.     Upon contact, the detectives found two males inside, and due to a language barrier, assistance from another FSCO detective, who is a native Spanish speaker was requested. Both occupants provided the detectives with United States Visas as form of identification. They were unable to provide the Detectives with proof of insurance.

25.     The driver of this vehicle was ultimately identified as Cesar Ramon MARTINEZ SOLIS. The passenger of this vehicle was identified as Humberto Ivan AMADOR GAVIRA.

26.     During this initial contact, Detective Jimenez with the FCSO arrived at the scene to translate. Detective Jimenez informed MARTINEZ SOLIS and AMADOR GAVIRA why they were contacted. He then requested MARTINEZ SOLIS and AMADOR GAVIRA to exit the vehicle so that he could speak to them separately.

27.     Detective Jimenez was informed by MARTINEZ SOLIS that they were from Durango, Mexico but were currently traveling from Utah where they had traveled to for the purpose of purchasing vehicles. MARTINEZ SOLIS advised that they were currently destined for Pueblo, Colorado. He further

explained that they had a business which involved purchasing, repairing and then reselling vehicles. Detective Jimenez inquired about the boxes located in the back of the van, MARTINEZ SOLIS suggested that Detective Jimenez speak to AMADOR GAVIRA for details regarding their contents. At this point, Detective Jimenez asked and received consent from MARTINEZ SOLIS to search the back of the vehicle.

28.    During the search of the vehicle, concealed within the rear passenger compartment, the Detectives found large amounts of ammunition inside boxes. Detectives with the FCSO visually estimated approximately 150 boxes of .308 ammunition, and approximately 30 boxes of 7.62 ammunition. Each box observed was labeled as to containing 1,000 rounds. Detectives also located two cell phones (the Device(s)), which they took possession of but set them aside in the front passenger seat.

29.    Detective Jimenez then spoke to AMADOR GAVIRA, who advised the Detective that the boxes contained 7.62 ammunition and that he and MARTINEZ SOLIS traveled to Utah to purchase the ammunition. Detective Jimenez further interviewed AMADOR GAVIRA, who explained that they purchase large quantities of ammunition to later resell it in Pueblo, Colorado and that the ammunition was the only thing which they purchased while in Utah. Detective Jimenez told AMADOR GAVIRA that MARTINEZ SOLIS had provided consent for the vehicle search. AMADOR GAVIRA responded that he did not have any objections. AMADOR GAVIRA advised Detective Jimenez that the vehicle was owned by MARTINEZ SOLIS, and that the registration to the vehicle should be in the front seat. AMADOR GAVIRA also told Detective Jimenez that they did not have a receipt for the purchase of the ammunition. AMADOR GAVIRA was asked who they sold the ammunition to, he responded by stating "just people I know".

30.    Detective Jimenez followed up with MARTINEZ SOLIS, who advised that the vehicle actually belonged to AMADOR GAVIRA.

31.     The driver, MARTINEZ SOLIS, was ultimately cited by the FCSO for operating an uninsured vehicle, transporting hazardous materials without a permit, improper use of auxiliary lighting, failure to dim his lights, operating a vehicle without license plate lamps, and failing to use a turn signal in violation of Colorado Revised Statutes. The passenger, AMADOR GAVIRA was cited by the FCSO for aiding in the violation of hazardous materials laws in violation of Colorado Revised Statutes.

32.     The vehicle was later secured and towed to a Fremont County Sheriff's Office storage facility pending further investigation and a search warrant.

33.     During the stop, the Detectives contacted an officer with the Immigration and Customs Enforcement's, Enforcement and Removal Operations (ERO). Once on scene, ERO officers determined that MARTINEZ SOLIS and AMADOR GAVIRA were possibly in violation of their nonimmigrant status by being in possession of ammunition.

34.     At this time, ERO contacted Special Agents (SAs) with the U.S. Department of Homeland Security, Homeland Security Investigations (HSI) to assist with the ongoing investigation.

35.     HSI SAs arrived at the location of the traffic stop and briefly assisted. While there, HSI SAs gained possession of the Device(s), both of which were previously discovered and detained by the FCSO, in the front passenger area of the vehicle. SAs obtained these Device(s), which were previously left in the front seat by the FCSO detectives. These Device(s) were kept in continuous and secured possession from the time they were seized, incident to the arrests, until they were secured as evidence in the Homeland Security Investigations Colorado Springs evidence room.

36.     MARTINEZ SOLIS and AMADOR GAVIRA were both transported to a local ICE detention facility for further investigation and immigration processing.

37.    At the local ICE facility, HSI SAs read MARTINEZ SOLIS the Miranda Advisement prior to interviewing him. MARTINEZ SOLIS agreed to speak to the SAs, and signed the Miranda Advisement, waiving his right to an attorney and agreeing to be interviewed by the SAs.

38.    During the interview MARTINEZ SOLIS explained the following:

    a) He and AMADOR GAVIRA, whom he claimed to be his brother-in-law, traveled from Mexico to Denver, Colorado on March 25, 2025, to purchase a vehicle. On March 26, 2025, they traveled to Salt Lake City, Utah to look at another vehicle which MARTINEZ SOLIS was interested in purchasing.

    b) While in Salt Lake City, he and AMADOR GAVIRA went to a firearm and ammunition store to purchase the ammunition. He claimed that all the ammunition located in the van was purchased at one store in Salt Lake City. MARTINEZ SOLIS advised that AMADOR GAVIRA was the person who actually purchased the ammunition. He further explained that he did not know the intent with the ammunition but that he believed it was destined for Pueblo, Colorado.

    c) MARTINEZ SOLIS explained that they departed Salt Lake City and were traveling to Pueblo, Colorado when they were contacted by the FCSO.

    d) When asked about a description or address to the ammunition store in Utah, MARTINEZ SOLIS explained that he did not know, but that the address and information was on his and AMADOR GAVIRA's cell phones, which HSI SAs had in their possession.

    e) When asked about where in Pueblo, Colorado they were taking the ammunition MARTINEZ SOLIS explained that he was unaware of the exact location, but that the destination address was on the AMADOR GAVIRA's cell phone.

    f) MARTINEZ SOLIS explained that one of the two Device(s) belonged to him, which SAs set aside and labeled as "MS". MARTINEZ SOLIS also explained that the other Device belonged to AMADOR GAVIRA, which SAs set aside and labeled as "AG".

39.    The Device which MARTINEZ SOLIS explained belonged to himself and was labeled as "MS" is the black iPhone 16 sealed in Homeland Security evidence bag # A1560028. The other Device which MARTINEZ SOLIS explained belonged to AMADOR GAVIRA and was labeled as "AG" is the black iPhone 16 sealed in Homeland Security evidence bag # A1560027.

40.    Based on MARTINEZ SOLIS's statements, the ammunition MARTINEZ SOLIS and AMADOR GAVIRA possessed traveled from Utah to Colorado and therefore traveled from one state to another and thus affected interstate commerce.

41.     The driver of this vehicle was ultimately identified as Cesar Ramon MARTINEZ SOLIS.

MARTINEZ SOLIS was in possession of a valid B2 nonimmigrant visa, which was issued on

10/25/2023 and expires on 10/23/2033. Further investigation revealed that MARTINEZ SOLIS is not a

citizen or resident of the United States of America, is a citizen of Mexico, and entered the United States

on March 25, 2025.

42.     Furthermore, the investigation did not establish any evidence MARTINEZ SOLIS entered the

United States under any of the exceptions set forth in 18 U.S.C. § 922(y)(2), such as lawful hunting or

sporting purposes, or in an official capacity of a foreign government.  Further investigation did not

reveal any Department of State records to indicate that MARTINEZ SOLIS had any designation as a

distinguished foreign government official, law enforcement officer whom entered the United States in

official capacity, nor did he possess a hunting license or claim to be in the United States for the purposes

of hunting or sporting events. Further, it is known to your affiant, that any foreign government official

admitted into the United States in the official capacity would have been admitted under an "A" Visa, not

a "B" Visa as in this circumstance.

43.     The passenger of this vehicle was identified as Humberto Ivan AMADOR GAVIRA. AMADOR

GAVIRA was in possession of a valid B2 nonimmigrant visa, which was issued on 11/18/2022, and

expires on 8/31/2032. Further investigation revealed that AMADOR GAVIRA is not a citizen or

national of the United States, is a citizen of Mexico, and entered the United States of America on March

25, 2025, under the B2 Visa.

44.     Furthermore, the investigation did not reveal any evidence that AMAROR GAVIRA entered the

United States under any of the exceptions set forth in 18 U.S.C. § 922(y)(2), such as lawful hunting or

sporting purposes, or in an official capacity of a foreign government.  Nor did he provide any

16

documentation to the contrary. Further investigation did not reveal any Department of State records to indicate that AMADOR GAVIRA had any designation as a distinguished foreign government official, law enforcement officer whom entered the United States in official capacity, nor did he possess a hunting license or claim to be in the United States for the purposes of hunting or sporting events. Further, it is known to your affiant, that any foreign government official admitted into the United States in the official capacity would have been admitted under an "A" Visa, not a "B" Visa as in this circumstance.

45.    On April 17, 2025, HSI Colorado Springs executed a federal search warrant on the aforementioned vehicle, which was operated by MARTINEZ SOLIS and AMADOR GAVIRA. During the search warrant execution, SAs found 95,000 rounds of Igman .308 ammunition, 91,200 rounds of Belom 7.62 ammunition for a total of approximately 186,200 rounds. SAs also located a ledger outlining other types of ammunition, which is suspected by SAs to essentially be a "shopping list".

46.    Based on the investigation described above, probable cause exists to believe that inside the Device(s) (described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of 18 U.S.C. § 922(g)(5)(B), as described in Attachment B.

//


//

17

47.    Therefore, your affiant respectfully requests that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

s/Adam Jennings
Complainant's signature

Adam Jennings, Special Agent, HSI
Printed name and title

SUBSCRIBED and SWORN before me this ___23rd___ day of April 2025.

Timothy P. OHara
Digitally signed by Timothy P. OHara
Date: 2025.04.23 16:19:39 -06'00'

THE HON. TIMOTHY P. O'HARA
UNITED STATES MAGISTRATE JUDGE

**This Affidavit was reviewed and submitted by Albert Buchman, Assistant United States Attorney.**

18